Erica **HARZEWSKI, et al., on their own behalf and on behalf of all other persons similarly situated, Plaintiffs–Appellants,**

v.

**GUIDANT CORPORATION, et al., Defendants–Appellees.**

No. 06–3752.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 2007.

Decided June 5, 2007.

Mark C. Rifkin (argued), Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, Kathleen A. Delaney, Delaney & Delaney, Indianapolis, IN, for Plaintiffs–Appellants.

Brian T. Ortelere (argued), Morgan, Lewis & Bockius, Philadelphia, PA, Boris Feldman, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, John R. Schaibley, III, Baker & Daniels, Indianapolis, IN, for Defendants–Appellees.

Elizabeth Hopkins (argued), Department of Labor, Office of the Solicitor, Washington, DC, for Amicus Curiae.

Before BAUER, POSNER, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

This is a class action under ERISA on behalf of participants and beneficiaries in a pension plan for employees of Guidant Corporation. A manufacturer of cardiovascular devices, Guidant was bought last year by Boston Scientific, which paid for each share of Guidant stock $42.28 in cash plus 1.6799 shares (worth $37.78 at the time, as each share was worth $22.49) of stock in Boston Scientific, for a total value of $80.06. The plan's portfolio included stock in Guidant held by an ESOP (employee stock ownership plan), and the suit claims that the pension plan's fiduciaries acted imprudently in failing to dispose of that stock between October 1, 2004, and November 3, 2005. The fiduciaries are various employees and board members of Guidant, all of whom were under the company's control (as ERISA permits, see 29 U.S.C. §§ 1102(c)(1), 1103(a)(1); *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919, 923–24 (10th Cir. 2006); U.S. Department of Labor, "Meeting Your Fiduciary Responsibilities," www.dol.gov/ebsa/publications/fiduciaryres ponsibility.html (visited May 17, 2007)), as was the ESOP. So for the sake of simplicity we shall pretend that Guidant is the only defendant and the only fiduciary.

October 2004 to November 2005 was a period, prior to Boston Scientific's acquisition of Guidant (which took place in April 2006), when according to the complaint the price of Guidant stock was inflated by a fraud committed by the company's management. The alleged fraud consisted of the concealment of information about defects in the company's implantable defibrillators, which accounted for nearly half its revenues. Very shortly after Boston Scientific's acquisition of Guidant, the full

gravity of Guidant's problems came to light and the revelation contributed to the drop in the price of Boston Scientific stock from $22.49 when Boston Scientific bought Guidant to $16.33 on May 3 of this year.

The district court dismissed the complaint on the ground that the named plaintiffs have no "standing" to bring this suit because they retired from Guidant and cashed out their pension benefits before the filing of the amended complaint, and so ceased to be participants in the pension plan. The lawyers for the class could, to keep the class action alive, have substituted as named plaintiffs members of the class who remained participants in the plan—current employees. But being unwilling to abandon the claims of class members in the situation of the named plaintiffs, they decided instead to appeal the district court's ruling.

To make the issue of "standing," as the parties call it, intelligible, we must say a bit more about the plan and the allegations. The plan is a defined-contribution plan, meaning that it does not specify the pension benefits to which participants are entitled. Rather, it establishes retirement accounts for each participant and a scheme for determining the character, amount, timing, etc., of contributions to those accounts by employer and employee. When a participant retires, his pension benefit is simply the balance in his account. Contributions to the Guidant pension plan and hence to the retirement accounts were to come from both a 401(k) plan and the ESOP, the former funded by employee contributions and matching employer contributions and the latter funded by Guidant's issuing common stock to the ESOP usually amounting to five percent of the employee's monthly salary. Apparently the ESOP component of the pension plan accounted for most of the value in most of the retirement accounts.

In December 2004, Guidant agreed to be sold to Johnson & Johnson for $76 a share. But before the deal could be consummated, problems with Guidant's products came to light. It was forced to recall hundreds of thousands of defibrillators and pacemakers; Johnson & Johnson began to get cold feet; and the Attorney General of New York filed a fraud complaint (still pending) against Guidant. (On Guidant's woes, see Barry Meier & Andrew Ross Sorkin, "Price Tag of Guidant Is Lowered," *N.Y. Times,* Nov. 16, 2005, at C1.) But although Guidant was thus in trouble toward the end of the period (which, remember, ran from October 2004 to November 2005) in which the plaintiffs contend that the pension plan's fiduciaries should have disposed of the plan's Guidant stock, it bounced back shortly afterwards, rising steadily until the company's sale to Boston Scientific in April 2006 (after Johnson & Johnson, having earlier lost interest, made a new offer, of $71 per share) for, as we said, a total consideration of $80.06 a share. (See accompanying charts graphing Guidant's share price from the beginning of 2004 to the acquisition by Boston Scientific, and Boston Scientific's share price thereafter.).

Had the pension plan been divested of its Guidant stock no later than November 2005, as the plaintiffs claim it should have been, the members of the class would have missed out on the sale of Guidant to Boston Scientific. It is unlikely that they would have done better from whatever substitute investment Guidant would have put them in. Even after Boston Scientific's stock tanked following the acquisition of Guidant, anyone who owned Guidant stock at the time of the acquisition re-ceived $42.28 per share in cash plus 1.6799 shares of Boston Scientific worth $27.43 as of May 3 of this year. The total of $69.71 exceeds the price of Boston Scientific on the last day of the class period ($57.57) and also the revised offer of $63 per share that Johnson & Johnson submitted twelve days after the class period ended. And it falls only slightly short of the $71 that Johnson & Johnson ultimately offered—an offer that the plaintiffs claim was inflated by that company's ignorance of the fraudu-

lent overvaluation of Guidant. So, had there been no fraud, the price that Johnson & Johnson and Boston Scientific would have offered for a share of Guidant stock would have been less than either the $80.06 that Boston Scientific eventually paid or the $69.71 in cash and stock that shareholders in Guidant when it was acquired by Boston Scientific still have. But whether the class was injured by Guidant's alleged imprudence in its capacity as the plan fiduciary (or whether, for that matter, Guidant *was* imprudent) has not been considered by the district court or raised as an issue in this appeal, and so we shall not try to resolve it.

The issue that has been raised and pressed is whether the plaintiffs are within the group of persons who are authorized to seek relief under ERISA. Section 502(a)(2) of the statute authorizes a participant in an ERISA-governed plan to sue "for appropriate relief under section 1109 [of Title 29]." 29 U.S.C. § 1132(a)(2). Section 1109 makes ERISA fiduciaries personally liable for breaches of their fiduciary duties. The named plaintiffs, however, cashed out of the plan during the course of the suit. That they cashed out after the complaint was filed, and before the amended complaint was filed, is immaterial. The parties' preoccupation with those filing dates is a product of the confusing use of the word "standing" to denote both a right to invoke the aid of the courts and a right to obtain a particular form of judicial relief.

■ Obviously the named plaintiffs have standing to sue in the sense of being entitled to ask for an exercise of the judicial power of the United States as that term in Article III of the Constitution has been interpreted, because if they win they will obtain a tangible benefit. But there is also a nonconstitutional doctrine of standing to sue, one aspect of which is the require-ment that the plaintiff be within the "zone of interests" of the statute or other source of rights under which he is suing. See, e.g., *Air Courier Conference of America v. American Postal Workers Union,* 498 U.S. 517, 523–26, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991); *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 395–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). The requirement has been used to bar some ERISA suits. E.g., *Miller v. Rite Aid Corp.,* 334 F.3d 335, 340–41 (3d Cir.2003). If someone brought a suit for ERISA benefits who had no possible legally protected interest in the pension plan (suppose he was merely a creditor of a plan participant), he would be outside the statute's domain, and the court would dismiss the case for want of jurisdiction even if the defendant had made no issue of the remoteness of the plaintiff's interest from the interests that ERISA protects, namely the interests of plan participants and beneficiaries. See, e.g., *Western Shoshone Business Council v. Babbitt,* 1 F.3d 1052, 1055–56 (10th Cir. 1993); *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1109 (9th Cir.1992); *National Union of Hospital & Health Care Employees v. Carey,* 557 F.2d 278, 280–81 (2d Cir.1977).

■ But if "zone of interests" were interpreted too broadly, standing and merits would merge, since any time a plaintiff failed to prove that the statute under which he was suing entitled him to relief, thus revealing that he was not someone whose interests the statute had been intended to protect, his suit would be dismissed for want of standing. Both *Coan v. Kaufman,* 457 F.3d 250, 256 and n. 3 (2d Cir.2006); and *Miller v. Rite Aid Corp., supra,* express misgivings about the merger of standing and merits that "zone of interest" analysis, unguardedly applied to the question whether an ERISA plaintiff is a "participant," might produce. Except in extreme cases illustrated by our example

of the attempt of the plan participant's creditor to enforce a claim to ERISA benefits, the question whether an ERISA plaintiff is a "participant" entitled to recover benefits under the Act should be treated as a question of statutory interpretation fundamental to the merits of the suit rather than as a question of the plaintiff's right to bring the suit. *Vartanian v. Monsanto Co.*, 14 F.3d 697, 701–02 (1st Cir.1994); cf. *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 492–94, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *American Federation of Government Employees, Local 2119 v. Cohen*, 171 F.3d 460, 469 (7th Cir.1999).

■ So, having cleared a lot of brushwood, let us turn at last to the merits. ERISA defines "participant" to include former employees who have cashed out their plan benefits, as the named plaintiffs in this case did, if they "may become eligible to receive a benefit of any type [from the plan]." 29 U.S.C. § 1002(7). So the question comes down to whether, if the plaintiffs win their case by obtaining a money judgment against Guidant, the receipt of that money will constitute the receipt of a plan benefit. It will. In the case of a defined-contribution plan, "an employee's retirement benefit is the eventual value of his or her account to which contributions have been made by the employer and/or the employee." *West v. AK Steel Corp.*, 484 F.3d 395, 398–99 (6th Cir. 2007); see also *United States v. Novak*, 476 F.3d 1041, 1061 (9th Cir.2007) (en banc). Suppose the amount is miscalculated to the participant's disadvantage and he discovers this later and sues. Because he is a former employee eligible to receive a benefit, he can maintain the suit under section 502(a) of ERISA. *West v. AK Steel Corp.*, supra, at 404–406, 409–410; *Coan v. Kaufman*, supra, 457 F.3d at 255–56; *Dobson v. Hartford Financial Ser-*

*vices Group, Inc.*, 389 F.3d 386, 398 (2d Cir.2004).

■ Some courts have had trouble seeing this because they strain to distinguish between "benefits" and "damages." ERISA does not say that a plan participant has the right to sue a plan fiduciary for damages, and the Supreme Court, noting the high level of detail in the Act's provisions for civil enforcement, 29 U.S.C. § 1132(a), has refused to allow courts to read such a right into the statute. *Mertens v. Hewitt Associates*, 508 U.S. 248, 255–56, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Not that monetary relief is excluded, but it must be relief to which the plan documents themselves entitle the participant. The statute authorizes suits for benefits, just not for damages separate from those benefits; so only "extracontractual damages are prohibited." *Glencoe v. Teachers Ins. & Annuity Ass'n*, No. 99–2417, 2000 WL 1578478, at *1 (4th Cir. Oct. 19, 2000) (per curiam); see also *Powell v. Chesapeake & Potomac Tel. Co.*, 780 F.2d 419, 424 (4th Cir.1985). The plaintiffs must therefore show that they are claiming an amount of money to which they are entitled by the plan documents over what they received when they retired and received the money in their retirement accounts.

Suppose Guidant had stolen half the money in a plan participant's retirement account and a suit by the participant resulted in a judgment for that amount; the suit would have established the retiree's eligibility for the larger benefit. There is no difference if instead of stealing the money from the account, Guidant by imprudent management caused the account to be half as valuable as it would have been under prudent management. The benefit in a defined-contribution pension

plan is, to repeat, just whatever is in the retirement account when the employee retires or *whatever would have been there had the plan honored the employee's entitlement,* which includes an entitlement to prudent management.

The idea that pension "benefits" refer to an amount specified in the plan confuses defined-contribution plans with defined-benefit plans. The latter specify a formula for computing benefits. The former specify a formula for making contributions to the retirement account, but the benefits themselves are not specified; they are just whatever is in the account when it is cashed out, provided the formula is properly applied. If the formula is misapplied to the participant's detriment, he can sue for an adjustment in the benefits designed to give him what he would have received had the formula been honored. What he cannot do is sue for damages, in the hope of obtaining punitive as well as compensatory damages. Punitive damages are not a plan benefit, because the plan documents do not create an entitlement to them. *Massachusetts Mutual Life Ins. Co. v. Russell, supra,* 473 U.S. at 144, 105 S.Ct. 3085; *Harsch v. Eisenberg,* 956 F.2d 651, 656, 660–61 (7th Cir.1992); *Dobson v. Hartford Financial Services Group, Inc., supra,* 389 F.3d at 397–98; *Fraser v. Lintas: Campbell–Ewald,* 56 F.3d 722, 724–26 (6th Cir.1995). Nor can he sue to obtain the statutory penalty for failing to provide plan documents to a participant, since that penalty is not a benefit either. *Winchester v. Pension Committee of Michael Reese Health Plan, Inc.,* 942 F.2d 1190, 1193 (7th Cir.1991). Nor seek damages for a plan's failure to advise a participant of an option that would enable him to avoid taxes, unless such advice was promised in the plan documents. *Fraser v. Lintas: Campbell–Ewald, supra,* 56 F.3d at 725–26. Nor sue for emotional distress resulting from a plan's failure to honor its obligations to a participant, *Reinking v. Philadelphia American Life Ins. Co.,* 910 F.2d 1210, 1219–20 (4th Cir.1990), overruled in part on other grounds in *Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017 (4th Cir.1993); that too could not be thought a suit for benefits.

The defendants argue that the plaintiffs don't need a remedy under ERISA because they can sue the defendants for securities fraud. But can they? The burden of proving fraud is heavier than that of proving a breach of fiduciary duty (provided, of course, that a fiduciary relation is established). Such a breach might consist in imprudent management (for example, failure to diversify), mistake, self-dealing and other conflicts of interest, or failure to remedy breaches of fiduciary duty by a co-fiduciary—all examples of misfeasance rather than malfeasance, involving no misrepresentations, and in short falling short of fraud. Compare 15 U.S.C. § 78u–4(b); *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), with 29 U.S.C. § 1104(a); *Massachusetts Mutual Life Ins. Co. v. Russell, supra,* 473 U.S. at 140 n. 8, 105 S.Ct. 3085; *LaScala v. Scrufari,* 479 F.3d 213, 220–22 (2d Cir.2007); *Smith v. Sydnor,* 184 F.3d 356, 357, 359–60, 362–63 (4th Cir.1999); *Felber v. Estate of Regan,* 117 F.3d 1084, 1086–87 (8th Cir.1997); *Concha v. London,* 62 F.3d 1493, 1502 (9th Cir.1995); *Morgan v. Independent Drivers Association Pension Plan,* 975 F.2d 1467, 1470–71 (10th Cir.1992). The duty of care, diligence, and loyalty imposed by the fiduciary principle is far more exacting than the duty imposed by tort law not to mislead a stranger. See, e.g., *Burdett v. Miller,* 957 F.2d 1375, 1381 (7th Cir.1992) ("a fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith—in fact to treat the principal as well as the

agent would treat himself"); *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, C.J.); cf. *Market Street Associates Ltd. v. Frey*, 941 F.2d 588, 594–95 (7th Cir.1991); *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir.2007).

We have approached the issue of a former employee's right to obtain monetary relief under ERISA for a breach of fiduciary duty by the fiduciary of a defined-contribution plan as one of first impression, as it largely is despite both parties' insistence that the case law compels the result for which each contends. (This is like the depressingly common case in which each party to a contract dispute insists that the "plain language" of the contract compels a judgment for him.) Forty-five of the cases that the parties cite are district court cases, which, as we tirelessly but futilely remind the bar, are not precedents. Most of the appellate cases the parties cite deal with unrelated issues, though some contain language that, taken out of context, as both sides do relentlessly, might appear to support one side of this case or the other. The sheer number of cases cited in the briefs—123 different cases—illustrates the regrettable tendency of some lawyers to substitute citations for analysis.

The defendants' best case, though falling far short, is *Kuntz v. Reese*, 785 F.2d 1410 (9th Cir.1986) (per curiam). The court disallowed a suit in which the plaintiffs claimed that they had been induced to work for the defendant, and thus become participants in its pension plan, by the defendant's misrepresentations concerning the rights and benefits that the plan would confer. They were not suing to enforce any entitlement created by the plan. They might have argued that the defendant should be estopped to deny that its representations *were* the plan. See *Coker v.*

*Trans World Airlines, Inc.*, 165 F.3d 579, 585–86 (7th Cir.1999); *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444–45 (5th Cir.2005). But they did not argue that.

The plaintiffs' best case is *Panaras v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 791 (7th Cir.1996). It holds that the benefits that a former employee may seek are not limited to defined benefits; in that case they involved severance benefits under a welfare plan. One might have thought the point obvious, but the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), had glossed "benefit" in section 1002(7) as "vested benefit," which has caused the lower courts a good deal of angst. But in context it is apparent that all the Court meant was that the former employee had to have an entitlement—had to show that had it not been for the trustees' breach of their fiduciary duty he would have been entitled to greater benefits than he received.

*Panaras* differs from this case, however, because it was plain what the plaintiff was entitled to. Here the entitlement is less definite, because it is an entitlement only to whatever the retirement account would have been worth had Guidant sold the Guidant stock held by the pension plan and invested the proceeds elsewhere. This also distinguishes the other case on which the plaintiffs particularly rely, *Sommers Drug Stores Company Employee Profit Sharing Trust v. Corrigan*, 883 F.2d 345 (5th Cir.1989). Former employees were permitted to sue the trustees of a defined-contribution plan for the fair market value of stock held by the plan that (the employees charged) the trustees had improperly disposed of for less than its fair market value. But the court thought the claim "quite close to a simple claim that benefits were miscalculated," *id.* at 350, and the

claim in this case is farther away from that.

■ Not that we approve of the distinction made in *Sommers*. Benefits are benefits; in a defined-contribution plan they are the value of the retirement account when the employee retires, and a breach of fiduciary duty that diminishes that value gives rise to a claim for benefits measured by the difference between what the retirement account was worth when the employee retired and cashed it out and what it would have been worth then had it not been for the breach of fiduciary duty. What seems to have troubled the court in *Sommers* is that a contractual or plan entitlement sounds like something quite definite, whereas in *Sommers* as in this case the amount of the entitlement is uncertain because it is whatever the plaintiff's retirement account would have contained when he retired had the account been managed without the manager's breaching the duties of a fiduciary. But there is nothing in ERISA to suggest that a benefit must be a liquidated amount in order to be recoverable.

The defendants argue in the alternative that our decision in *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404 (7th Cir.2006), compels affirmance by exempting the trustee of an ESOP from liability for failing to dispose of stock of the employer. But that is not what *Summers* holds. The question was whether the participants in the ESOP had a remedy against the ESOP trustee for the trustee's failure to dispose of the employer's stock as the market price of the stock fell (ending at zero). We said that the trustee could not be faulted for failing to second-guess the stock market, and while it could be faulted for failing to recognize (and, by diversifying, reduce) the risk that the drop in price was imposing on the ESOP's participants because of the increase in the employer's debt-equity ratio brought about by the fall in its market value, the plaintiffs had never sought to "determine the point at which the ESOP trustee should [have sold] in order to protect the employee-shareholder against excessive risk." *Id.* at 411. The claim in this case is that Guidant knew that the price of its stock was overvalued but took no measures to protect the participants in the pension plan, as it could have done by selling the Guidant stock held by the plan before the overvaluation was discovered by the market and its price plummeted. The plaintiffs have not yet had an opportunity to try to prove that there was such a window of opportunity. Remember that the suit was dismissed for failure to state a claim; there has been no discovery.

So the case must go back to the district court. But as its first order of business, that court will have to take a very careful look at the plaintiffs' theory of how they were injured. As explained earlier in this opinion, had the Guidant stock held by the pension plan been sold by November 2005, as the plaintiffs claim should have been done, they and the rest of the class would not have benefited from the sale of Guidant to Boston Scientific for a total consideration of $80.06 a share in April 2006. It seems exceedingly speculative to suppose that Guidant in its capacity as plan fiduciary should and would have found a substitute investment that would have turned out as well as the sale of Guidant to Boston Scientific turned out. Later, it is true, Boston Scientific's stock, which replaced the Guidant stock in the ESOP, lost value. But aside from the difficulty of parceling out that loss between continued problems with Guidant's products and Boston Scientific's own problems unrelated to the acquisition, we noted earlier that even after the drop in Boston Scientific's stock price the ESOP's stock holdings combined with the

cash received in the deal were worth more than the Guidant stock had been worth at the end of the class period.

It probably would have been unlawful, moreover, for Guidant to sell the Guidant stock held by the pension plan on the basis of inside knowledge of the company's problems. If so, there are no damages, and indeed no breach of fiduciary duty; for the fiduciary's duty of loyalty does not extend to violating the law. *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098 n. 4 (9th Cir.2004), intimates that an ESOP trustee cannot trade on inside information, and this is also the SEC's view. Securities and Exchange Commission, "Employee Benefit Plans," 1980 WL 29482, at *28 and n. 168 (S.E.C. Securities Act of 1933 Release No. 33–6188, Feb. 1, 1980); cf. *Schlansky v. United Merchants & Mfrs., Inc.*, 443 F.Supp. 1054, 1062 (S.D.N.Y. 1977); Craig C. Martin et al., "What's Up on Stock–Drops? *Moench* Revisited," 39 *John Marshall L.Rev.* 605, 629 (2006). But this is another issue to be considered in the first instance on remand, should its resolution become critical to the outcome.

VACATED AND REMANDED, WITH DIRECTIONS.

RIPPLE, Circuit Judge.

I am pleased to join that part of the panel's fine opinion that holds that the district court erred in dismissing this case for lack of standing. In my view, it would be far better, as a prudential matter, to refrain from commentary on the merits at this time. Therefore, I respectfully decline to join that part of the panel's opinion that addresses the merits of the case.